UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

MICHAEL TULLGREN,                    :
                                     :
            Plaintiff,               :   Civil Action
                                     :   No. 1:22-cv-00856-MSN-IDD
      v.                             :
                                     :
BOOZ ALLEN HAMILTON INC., et         :   February 3, 2023
al.,                                 :   9:54 a.m.
                                     :
            Defendants.              :
                                     :
.............................. :

ANDRE HALL, et al.,                  :
                                     :
            Plaintiffs,              :   Civil Action
                                     :   No. 1:22-cv-00857-MSN-IDD
      v.                             :
                                     :
CAPITAL ONE FINANCIAL                :
CORPORATION, et al.,                 :
                                     :
            Defendants.              :
                                     :
.............................. :


TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE MICHAEL S. NACHMANOFF,
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

  For the Plaintiffs:          MILLER SHAH LLP
                               James C. Shah, Esq.
                               John Claude Roberts, Esq.
                               *Pro hac vice*
                               1845 Walnut Street
                               Suite 806
                               Philadelphia, PA 19103


                          (Continued)

*Diane Salters, B.S., CSR, RPR, RCR*
Official Court Reporter

(Continued)

For the Plaintiffs:           TYCKO & ZAVAREEI LLP
                              Glenn Edward Chappell, Esq.
                              2000 Pennsylvania Avenue NW
                              Suite 1010
                              Washington, D.C. 20036

For the Defendants:           MORGAN LEWIS & BOCKIUS LLP
                              Matthew James Sharbaugh, Esq.
                              1111 Pennsylvania Avenue NW
                              Washington, D.C. 20004

                              Jeremy P. Blumenfeld, Esq.
                              Jared R. Killeen, Esq.
                              *Pro hac vice*
                              1701 Market Street
                              Philadelphia, PA 19103

Court Reporter:               Diane Salters, B.S., CSR, RPR, RCR
                              Official Court Reporter
                              United States District Court
                              401 Courthouse Square
                              Alexandria, VA 22314
                              Email: Dianesalters.edva@gmail.com
                              Telephone:  (301) 338-8033

Proceedings reported by machine shorthand.  Transcript produced by computer-aided transcription.

*Proceedings*

THE COURTROOM DEPUTY:  *Hall, et al. v. Capital One, et. al.*, Case Number 22-cv-857; *Tullgren v. Booz Allen Hamilton*, Case Number 22-cv-856.  Will the parties please note their appearances for the record.

MR. SHAH:  Good morning, Your Honor.  James Shah from Miller Shah on behalf of the plaintiffs in both cases.

THE COURT:  Good morning.

MR. ROBERTS:  Good morning, Your Honor.  John Roberts for Miller Shah on behalf of the plaintiffs in both cases.

MR. CHAPPELL:  Good morning, Your Honor.  Glenn Chappell from Tycko & Zavareei on behalf of plaintiffs in both cases.

THE COURT:  Good morning to you all.

MR. SHARBAUGH:  Good morning, Your Honor.  Matthew Sharbaugh from Morgan Lewis on behalf of both defendants.

MR. BLUMENFELD:  Good morning, Your Honor.  Jeremy Blumenfeld from Morgan Lewis on behalf of defendants.

MR. KILLEEN:  Good morning, Your Honor.  Jared Killeen with Morgan Lewis on behalf of the Capital One defendants.

THE COURT:  Good morning.  Good morning to you all. We're back for round two, and I've received the motion, the memorandum, the opposition, and the reply brief, and I've reviewed them.  I will hear argument at this time.  Are we going to hear from Mr. Blumenfeld and Mr. Shah again today, or we're going to have new folks arguing?

*Proceedings*

MR. SHARBAUGH:  At least for our part, Judge, you're going to hear a different voice this morning, if that's all right.

THE COURT:  All right.

MR. SHAH:  You get the same voice from our side, Your Honor, for better or worse.

THE COURT:  That's all right.

Well it's your motion, Mr. Sharbaugh.  I will hear from you.  I will tell you I am most focused on the differences between the original complaint and the amended complaint, and so if you want to focus your arguments there, you can do so.

MR. SHARBAUGH:  Thank you, Judge.  Good morning. Matthew Sharbaugh on behalf of the defendants.

The amended complaints in these cases, Judge, assert the same theory of fiduciary breach as before, based on the same sets of allegations this Court already dismissed.  Specifically, plaintiffs say that these plan fiduciaries must have used a process that was imprudent, that is, they acted outside the range of reasonable judgments fiduciaries can make, simply because, again, they offered the BlackRock target-date funds as investment options when a few other funds allegedly performed better across a few years in the relevant period.  These allegations, Judge, still don't state a claim as a matter of law.

In dismissing the case a few months ago, the Court's reasoning was twofold:  Number 1, plaintiffs did not allege any

*Proceedings*

meaningful benchmarks for the BlackRock funds; and, Number 2, their allegations did not show that the BlackRock funds severely underperformed in any case.  Both those issues remain and both warrant dismissal again.

I would like to start briefly with the second issue, the underperformance allegations, before turning back to the benchmark piece.  The last time we were here, the Court expressed concerns that plaintiffs' performance allegations were already focused on too narrow a period of time, especially for target-date funds like the ones at issue here, which, by design, are intended to grow for decades.  But, now, instead of expanding those allegations, the amended complaints actually shrink them even more.  Plaintiffs dropped all their performance allegations from the end of 2019 forward, almost two years of information, and now they focus on an even shorter three-year period from 2016 to 2019 alone, basically just the first half of the putative class period here.  They didn't add to those allegations, Judge; they took away from them.  Now --

THE COURT:  Let me interrupt you and just ask, real quick, to understand facts, and then I'll let plaintiffs' counsel address this as well.  I think they refer to a number of $90 million in a couple of spots in the complaint, meaning that the aggregate amount of money that could have been made, had there been different investment decisions, was $90 million.  How do you understand where that number comes from?

*Proceedings*

MR. SHARBAUGH:  My sense, Judge, is it may be a cumulative number, but the problem -- to come back to what we talked about before -- is that they're focused on just a few short years of performance data; and when we're talking about investments that have a life of 30 or 40 or 50 years, and when you zero in on such a small period and ignore other periods -- which I don't think anyone can dispute show that the BlackRock funds performed better than many, if not all, of the comparator funds -- you don't get a full picture of what's at issue here, and it's this very self-selecting sort of cherry-picked perspective that supports their narrative.

So I think the idea is they're running away from allegations that really undermine their core premise here, which is that the BlackRock funds were deplorable investments, and that's especially important, Judge, because, again, we're only talking about performance here, that's it.  There's no other new red flags alleged in the complaint.  There's no allegations of an inexperienced investment manager or excessive costs or any other red flags.  It's the same as before, just performance.

And I think it's worth mentioning another case we cited in our briefs, the *Fluor* case, out of the Northern District of Texas, where the judge talked about this exact problem.  That case also turned on a performance-based challenge to target-date funds that were alleged to mirror the same BlackRock funds at issue here, and the judge agreed wholeheartedly with this premise

*Proceedings*

that performance itself can't be enough to show imprudence, because when you talk about investing and the unpredictabilities of the market and external market factors, you just can't draw a correlation between performance and process, right?  As the judge in *Fluor* put it, quote:  A flawed fiduciary process can result in great returns while a diligent and complete fiduciary process can result in underperformance.

THE COURT:  So under that theory, there is no amount of loss that would be sufficient to justify a breach of fiduciary duty based on poor performance?  In other words, here -- and there are a lot of charts in the amended complaint -- it shows underperformance in various quarters, sometimes by less than one percent, sometimes a little bit more than two percent, but is your argument that even if it were, you know, ten percent, 20 percent, or some enormous amount, that that alone couldn't raise a plausible inference of a breach of fiduciary duty simply because we don't know enough about why that would account for one stock doing better than another or one set of assets doing better than another, or is there some point at which the degree of poor performance could be a basis for moving forward with the breach of fiduciary duty claim?

MR. SHARBAUGH:  So I guess I would say it depends, Judge.  That's not this case in front of this Court right now.  I think the courts of appeals, at least, that have looked at this -- the *CommonSpirit* case out of the Sixth Circuit, probably

*Proceedings*

chief among them -- would support the idea that you can't just point to performance, especially like here, over a really short period of time and draw any inference about an imprudent process from that fact alone.  That court talks about other red flags that would be necessary before you could make that finding.

But, frankly, Judge, I don't think you need to go that far in this case because of the other issues that are affected here in the amended complaint, and I think particularly given the spotty and, again, even more narrow underperformance allegations than you dismissed the last time around.

So I think, again, all those reasons are one path the Court can take to dismiss the complaint again, because the underperformance allegations here just don't suffice.

But plaintiffs have another problem, too, which brings me back to the first point about the lack of meaningful benchmarks.  And I realize this reference would have been perfect if we were here yesterday, but I'm going to try it out anyway: Judge, it's Groundhog Day all over again.  The amended complaints use the same four comparator funds that the Court already rejected as fatally different based on the same allegations and the same facts:  Passive versus active investments, "to" retirement versus "through" retirement glide paths, and different asset allocations.  And more than that, the opposition brief goes so far as to replay the argument that they shouldn't even have to plead meaningful benchmarks at all.  They say, again, that

arguments about the appropriateness of benchmarks raise, quote, factual disputes -- plaintiffs' words -- that require discovery. But with respect, Judge, that's just not the law, as all the courts of appeals to consider this issue have held and as this Court held just a few months ago.

So what's new? Two things: Plaintiffs offer one new comparator and one new performance metric, but neither of those changed the analysis. As to the new comparator, plaintiffs point to the S&P Target Date Index. First, the amended complaints admit that that's just an amalgamation -- again, their word -- a mash-up of all target-date funds in the market, including the same failed comparator funds from before. So that means it reflects the same disparate strategies and styles present in all target-date funds, passive and active, "to" retirement and "through" retirement, all sorts of different asset allocations. And, again, this is drawn right out of the amended complaints. Plaintiffs allege this in paragraph 41 of the Booz Allen amended complaint and in paragraph 43 of the Capital One amended complaint. And for the same reasons that those differences made the comparator funds inapt themselves, they render the S&P Target Date Index inapt as well, because it's just a mash-up, an amalgamation of those same investments.

In fact, as we pointed out in our briefs, this is the same tactic the plaintiffs in the *Genentech* case, which the Court may remember, in California used to try to resurrect their

*Proceedings*

target-date fund challenge in that case.  After the Court dismissed the complaint originally based on two target-date funds that were not apt comparators, the plaintiffs added allegations about the S&P Target Date Index fund.

THE COURT:  Are you aware of any court that's recognized the S&P Target Date Index as providing a basis for an allegation of a breach of fiduciary duty based on underperformance?

MR. SHARBAUGH:  No, Judge, no.  And, again, the problem for that is really what we lay out in our briefs.  You know, there are other courts that have looked to different -- or at least have been asked to consider different averages and medians and indices for comparator purposes, but the problem comes back to what you've already identified, which is you need specific comparisons between styles and strategies and risks; and when you talk about averages, it doesn't account for any of those differences whatsoever.

THE COURT:  Well, how do you respond to the argument that adding in the Sharpe ratio essentially takes away those differences?

MR. SHARBAUGH:  Right.  So the Sharpe ratio doesn't change anything either, because as we talk about, the Sharpe ratio is just another performance metric.  It's a way to measure performance in hindsight, after the fact:  How did an investment perform, granted, on a risk-adjusted return basis here.  But it's

*Proceedings*

a performance metric all the same.  And so whether you're talking about performance returns or Sharpe ratios, it's really just a dodge of the meaningful benchmark requirement in the first place, because every investment, Judge, has a Sharpe ratio.  You can identify a Sharpe ratio for any investment.  You could say a Treasury bond fund has a Sharpe ratio of one and a foreign equity fund has a Sharpe ratio of one.  They're the same Sharpe ratios, but it doesn't mean the underlying investments themselves are the same in the first place; and that's what plaintiffs have to show, again, a meaningful benchmark in terms of styles and strategies and risks in order to compare them in the first place.

I think it's also worth noting, Judge Nachmanoff, that the amended complaints don't allege the actual numerical Sharpe ratios, to boot.  They rank them, granted, on a scale of one to five, but we don't know anything about the magnitudes of difference that are involved in the Sharpe ratios.  So is the best Sharpe ratio four points higher than the worst?  Is it one point higher?  Is it a few hundredths of a point higher?  I think those differences matter.  If you have five sprinters in a race, somebody's going to win and somebody's going to come in fifth.  You can draw one inference just from that fact alone, but if you find out that it was a photo finish and everybody finished within a tenth of a second of one another, well, that's a bit of a different takeaway at the end of the day.  That doesn't tell you all that much about who was faster than the other.

*Proceedings*

And I think that leads into another problem with this theory, too, which we talked about before:  If plaintiffs are correct that the BlackRock funds, having the fifth worst performance against five other target-date funds, can state a claim, whether based on actual returns or Sharpe ratios or anything else, then the target-date fund that was fourth best or third best would be subject to a claim of imprudence, too, because there would be three other funds or two other funds or maybe even one other fund that did better.  But, again, that's just not the law when it comes to performance, which is why ERISA focuses on process, not results.

So, again, the fact that they added this new performance metric, again, obscured through generic rankings -- we don't even know the magnitude -- doesn't change the fact that their claims here still hinge on underperformance alone; and that underperformance, especially against an even narrower window than before, is not enough to state a claim, especially when they're not alleging underperformance against meaningful benchmarks in the first place.

Unless the Court has other questions, that's all I have.

THE COURT:  No.  I will hear from Mr. Shah.  Thank you.

MR. SHARBAUGH:  Thank you.

MR. SHAH:  Good morning, Your Honor.

THE COURT:  Good morning.

*Proceedings*

MR. SHAH:  Let me start with the notion of duration. Your Honor asked about that, and I referenced the case *Miller v. Astellas* -- it's a 2001 Weslaw case from the Northern District of Illinois -- where the court there held that there is no particular durational threshold required for underperformance allegations to contribute to an inference of imprudence.

And let's just address my colleague's argument that, somehow, we're looking -- or asking the Court, from a Rule 8 standpoint, to look at a narrow several-year period.  The allegations in paragraphs 42 and 44 of the respective complaints, which detail the charts, which Your Honor is, undoubtedly, familiar with, that starts in the second quarter of 2016.  But as we note in the complaint, that starting in 2016, we're looking at three- and five-year annualized periods, the same periods for which the fiduciaries would have had real-time data.  So it's not 2016 through 2019.  The complaints set forth real-time data that would have been known to the fiduciaries going back to 2Q 2011. So the notion that this is somehow a truncated period of time of underperformance, as alleged, is simply not consistent with the allegations in the complaint.  We're talking about closer to a decade.

Let me turn to --

THE COURT:  I'm sorry.  I understand that, and I understand you made that clear that it's really 2011 through 2019 when you look at the three- and five-year time periods, but can

*Proceedings*

you tell me why you dropped that time off?  Obviously, the Court is focused on the differences between the original complaint and the amended complaint, and so that was one of the differences.  The others were what you added, but there were certain things you took away.  Why did you do that?

MR. SHAH:  Sure.  And, obviously, we're aware that's of the record and we're aware of the argument, and we've acknowledged there was some marginal improvement.  I think what was getting lost is that that was the type of hindsight analysis, looking at the last several years, that we've been accused of doing and which the law doesn't permit.

As the Court is aware, the cases are very clear that the fiduciary breach occurs at the time the investment is offered and should not be offered; and the allegations in the complaint relate to the imprudence occurring during the period of time where the charts in the amended complaints are focused.  So it's not because we wanted to erase it.  We've acknowledged it existed.  That time frame was not pertinent to the legal analysis to when the fiduciary should have acted and what the damages are that flow therefrom.

Counsel talked on, earlier, the two primary additions to the amended complaint that we think address, squarely, this Court's concerns.  So let's talk about the S&P benchmark.  As we allege, the S&P benchmark is acknowledged by Morningstar as being the most used benchmark in the industry to assess the performance

of target-date funds, and we know that now to be the case, as borne out, as we learned after the filing of the amended complaint. But in the Genworth IPS, the metric that the fiduciaries there are instructed to use in their investment policy statement to assess the performance of the BlackRock TDF funds that are challenged here is the index that we utilize in the amended complaint in which we allege and demonstrate, utilizing that benchmark, still shows significant underperformance over this elongated period. So not only do we have specific allegations that it is the most used benchmark in the industry, per Morningstar, to do exactly what we're doing, and that is to assess the performance of the challenged funds, but we know that one of the top ten investors in the BlackRock funds, by way of a retirement plan, that that's the metric that it sets forth in its investment policy statement which governs the fiduciary conduct of the investment committee there.

THE COURT: And so just to make sure I'm understanding the argument, the argument is that, again, you've got some information that in another case with another defendant, they were actually using the S&P Target Date Index as a comparator as they were looking at the performance of the BlackRock TDF? Is that --

MR. SHAH: As a comparator -- as a benchmark.

THE COURT: As a benchmark. And so in real-time -- again, not in hindsight -- your argument is at the time the plan

*Proceedings*

administrators were doing this, they should have seen that the S&P Target Date Index was showing a return of X, and in comparing that to BlackRock, BlackRock was lower; and at some point, in order to fulfill their fiduciary duties, they should have said, We need to pull the plug on this BlackRock because it's just performing below the expectations when we compare it to the S&P target-date fund?  Is that a correct summary of what you're saying should have happened?

MR. SHAH:  Well, correct, that that was a metric that was known -- a benchmark that was known and commonly utilized in the industry.  And we don't know what was in the IPS -- maybe that's in the IPS -- but had the fiduciaries looked at that benchmark in assessing the performance of the BlackRock funds, as set forth in the complaint throughout those series of charts, it would have shown an elongated and continual period of underperformance.

THE COURT:  And am I right -- I think I referred when speaking to your opposing counsel -- that looking at those charts, that sometimes that underperformance was less than one percent and sometimes it was more than one percent or even two percent?  I don't think it was anything significantly above that; is that right?

MR. SHAH:  Let me just put that in context, and I know we had this discussion the last time I was before Your Honor, is that those are annualized numbers.  So, for example, if Your

*Proceedings*

Honor will recall, they picked a specific vintage and cherry-picked, I think, one quarter, and said, Oh, well, look, over three years, this is only like a .01 and point -- it's in the transcript, as I pointed out, for the vintage. When you do it over a three- and five-year annualized period, I think it was something like a three- and six-percent differential. And when we used another example from a different quarter from that same vintage, it was something like eight percent and sixteen-percent difference in returns over a three- and five-year period. So even though the numbers do look small, it has to be viewed in the context of what that means numerically and monetarily when one does it on an annualized basis.

THE COURT:  I guess I'm having a little bit of a hard time understanding. One of the arguments you make is that this can't be viewed in hindsight. And so if the argument is as the plan administrators are looking at this quarter by quarter, they're looking at some quarters are good, some quarters are bad -- as the judge in the Northern District of California said, sometimes stocks underperform. You know, we all know that from our own personal experience. I'm trying to understand the essence of the claim as to the breach of fiduciary duty in real-time; in other words, that if you see in a particular quarter -- even over a couple of quarters -- that there is less money being made, monies being lost, or that they're underperforming, at what point do the plan administrators say to

*Proceedings*

themselves, Well this is something that is intolerable?

MR. SHAH:  Sure.  And we addressed this, and I know I cited to the case from the Northern District of Illinois, but in our complaint, we specifically note that within the industry, and in IPSes in particular, the general time horizon the fiduciaries use is a three- and five-year time horizon.  That is the industry standard for how you assess the performance or underperformance of funds.  And so as of 3Q 2016 -- which is where we start the analysis -- the fiduciaries, based on that five-year annualized underperformance, would have known for a five-year period that there was prolonged and significant underperformance for that entire period, and then moving on to the next quarter and the next quarter and the next quarter.  So, not surprisingly, courts don't say, you know, three years and one quarter, right?  But, again, we're here on a Rule 8 standard plausibility, and we have nearly a decade of pronounced underperformance, not only in connection with the S&P benchmark, but also the Sharpe ratio. And I will turn to that to address counsel's statements regarding that.

So as Your Honor will recall, there was a lengthy discussion at the last hearing about issues regarding asset allocation, different risks.  So as we allege in the amended complaints, the Sharpe ratio is commonly used in the industry and in IPSes as a tool, as a metric for committee members, fiduciaries to understand what the relative performance is when

*Proceedings*

you account for risk adjustment.  So that's what we've done here. So we've addressed any concerns about differences in equity allocation by utilizing the Sharpe ratio.  What we haven't done, and what counsel suggested is, we're not asking the Court to use the Sharpe ratio to compare REIT to a bond or to unlike investments.  We're comparing target-date funds to target-date funds.  The issue, simply, that was raised and the Court had some concern about is we have a different glide path.  You have, potentially, different asset allocation, so, ergo, perhaps, a different risk.

Now, we previously argued, and I've argued, as to why we have allegations in there that we think negate that, but the inclusion of the Sharpe ratio absolutely negates that and continues to demonstrate -- as did the comparators, as did the S&P index -- pronounced and prolonged and continual underperformance of the challenged fund.  And I will say -- and you referenced the case from the Northern District of California -- a couple of things to note about that.  There was no utilization of the Sharpe ratio there.  There, the Intel TDF that was challenged, the court specifically held, Your Honor, that there was no benchmark, there was no comparator that was utilized that was shown to be something that was used within the industry for this particular TDF.  We have quite the opposite here.  We have specific allegations about the S&P Target Date Index being the most commonly used performance benchmark in the

*Proceedings*

TDF marketplace, as per Morningstar, but we also have -- and I know it's not in the amended complaint because it became public after -- but we have evidence that right down the road, Genworth, in its IPS, which has also billions of dollars invested in the challenged BlackRock fund, is using that very benchmark -- its fiduciaries are -- to determine whether or not it's a prudent investment.  I am aware --

THE COURT:  I'm sorry, I didn't mean to interrupt, but I just wanted to make sure I'm getting these cases straight.  Was it *Genentech* where the S&P target-date fund was also proposed as a potential benchmark and rejected by the district court?

MR. SHAH:  It is.  That was in front of Judge Orrick.  There, there were common funds.  The Genentech funds were all custom funds, and that was something, if you look at the opinion, the court had real issue with, as opposed to what we have here, the BlackRock TDF, which is, as the Court is aware from the pleading, one of the six that make up three-quarters of the TDF marketplace in the U.S.  So I think that's very different.

And I would -- I also want to note the *Moler* case, which we talked about last time, but that's from the District of Maryland.  And kind of speaking to the notion of performance in Rule 8, that court --

THE COURT:  So -- sorry, go ahead.

MR. SHAH:  That's fine.

THE COURT:  No, no.  I interrupted.  Go ahead.

*Proceedings*

MR. SHAH:  That court specifically talks about the ability to infer an imprudent process when you have what we have here, real-time data in three- and five-year increments, and we go beyond that.

And let me just also say, with respect to this process, because I think it's very important, and I think, in all candor, the Genworth IPS and what we've learned from that is completely proof of this notion in the law, and that is that plan participants, at the motion to dismiss stage, are not considered to likely have insight into the process of a committee, right? And that's why the law says if you can show significant underperformance for a period of time, then you can infer an imprudent process.  And, again, you know, we cite a multitude of cases from *Sweda* on.

THE COURT:  Well, let me ask a question with regard to *Moler*, but also the same question I asked your opposing counsel: Did *Moler* involve purely a claim of underperformance as a basis, or did it have excessive fees or some other allegation?

MR. SHAH:  I'm told by my colleague that there were other factors.

THE COURT:  And so that gets to the question, really, that I'm grappling with that I asked Mr. Shah about, which is, can you point to other courts -- and I know you have many of these cases right now, and I have a feeling we may be on the front end of deciding the motion to dismiss here -- but can you

*Proceedings*

point to a court that has relied solely on underperformance to move past the motion to dismiss on a breach of fiduciary claim without the addition of excessive fees or conflict of interest or the things that we associate with breach of fiduciary duty in other contexts?

MR. SHAH:  And I think my answer to that is that when you look at what the Supreme Court instructed in *Tibble* and *Hughes*, everything is context specific.  And under *Twombly* and *Iqbal*, based on the allegations, the substantial allegations that we have here, and the notion that courts have indicated, that underperformance can give rise to an inference of imprudence, we certainly think that we have satisfied that threshold with the allegations of the elongated period of significant underperformance using the benchmarks and the metrics and the comparators.  And so to that end, I would say that the body of fiduciary law does not foreclose or preclude a case from moving forward under those circumstances.  And I would also say I am unaware of any case in the country that has held that where you have a challenged fund and where the benchmark is being utilized to show why the fund is being challenged and to demonstrate significant underperformance is acknowledged and pled to be the most commonly used benchmark for assessing performance for that investment in the industry.  And on top of that, we have evidence before the Court that that benchmark that we've utilized in the amended pleadings is the benchmark in an investment policy

23

*Proceedings*

statement for one of the largest 401(k) plans in the country that has billions of dollars invested in the very challenged funds and TDF suite here.  I'm aware of no case on those facts that suggest that the Rule 8 pleading standard hasn't been satisfied.

I appreciate --

THE COURT:  But to answer my question, the answer would be not yet.

MR. SHAH:  Fair enough.

THE COURT:  Okay.  Thank you.  I'm not making light of it.

MR. SHAH:  Always appreciate Your Honor's time.

THE COURT:  I understand your argument.  Thank you.

MR. SHARBAUGH:  Thank you, Judge.

Just a few quick responses.  First, Mr. Shah opened his remarks with a reference to the *Astellas* case in Illinois.  That's a case, Judge, that presents the exact problem you were just talking about.  It wasn't just an underperformance case; that was a self-dealing case, as it was alleged, as well.  Aon became the investment manager.  Aon suddenly changed many of the funds to Aon funds, and so there was a self-dealing component to that case as well.  So that really sets that case apart from this one.

With respect to the issue of shortening the performance period, one of the answers is that they're looking at cumulative returns over a certain period of time that really goes back to

*Proceedings*

2011, and so it's more than just three years.  Be that as it may, those were the same allegations in the original complaint with respect to the longer period at issue, and they've still shortened it even more than that.

And I just want to say, to the extent that they assert we're arguing from hindsight, look, we're not.  I'm not arguing that the positive performance somehow exonerates, you know, any fiduciary issues or that that should preclude a claim.  The point is they're the ones pointing to performance, and performance alone, as the basis for arguing that something was wrong here, and you can't do that in a spotty and selective way that runs away from the data that just doesn't support your theory, and that's effectively what's happening here.  That was our point.

With respect to the S&P Target Date Index, a couple quick points on that:  Number 1 -- we talked about this in our briefs -- there's multiple categories of that index, including a style specific index that only includes "to" retirement target-date funds, like the BlackRock funds here; and the plaintiffs didn't even use that one in terms of pointing to the S&P Index as a comparator.  They use a general index which just lumps together everything.  Again, that's not to say that the "to" retirement index would be any better, but it just highlights the fact that as between the amended complaint and the original complaint, plaintiffs have not addressed the Court's concerns from before in terms of comparing apples to apples, in terms of

*Proceedings*

styles and strategies.

With respect to this issue about the S&P Target Date Index being used in another plan based on allegations in another complaint, look, we know what the test is for a meaningful benchmark.  The courts have told us that; you've told us that in this case; and the test is not some other fiduciary in the world uses a particular metric to cross-reference an investment. That's just not the test.  They've got to show that it's another investment with the same styles, strategies, risks.  And for all the reasons we've said, that's just not what this is.

I will also note -- I don't agree with this -- plaintiffs have accused those fiduciaries of acting imprudently as well.  They're suing the Genworth fiduciaries over the same issue.  So if you think about it, they're arguing that we should have used a benchmark that other allegedly imprudent fiduciaries use so that we would have had a prudent -- I get a little twisted up with that logic myself.

THE COURT:  Well, in fairness, maybe they've got a stronger claim against Genworth.  If Genworth was using a particular comparator and then didn't choose to take BlackRock off the table, maybe they'll be able to make an allegation that they had it in front of them in real-time, it wasn't hindsight, and they should have acted differently.  But that's not the case here.

MR. SHARBAUGH:  That's not this case, Judge, I think is

26

the main point.  And, again, that's not the test for meaningful benchmark.  We know what that test is.  Your prior ruling relied on that test, and that's the test that they have to meet here.

So unless the Court has other questions, that's all I have.

THE COURT:  Thank you.

Well, as much as I would like to rule from the bench, and I know I tried to help the matter move forward by ruling from the bench last time, I will take this matter under advisement.  I want to give it the attention that it's due.  I appreciate the briefing and the argument this morning.  I will endeavor to issue a decision as promptly as possible, but I will take the matter under advisement.  And I thank you, Counsel, for your arguments this morning.  Thank you.

                *       *       *       *       *

                    CERTIFICATE OF REPORTER

    I, Diane Salters, hereby certify that the foregoing transcript is a true and accurate record of the stenographic proceedings in this matter.


                              /s/ Diane Salters

                              _____

                              Diane Salters, CSR, RCR, RPR
                              Official Court Reporter